UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

L.V.M., a minor, by and through his next friend :
EDITH ESMERALDA MEJIA DE GALINDO, :
on his own behalf and on behalf of others similarly :
situated, :
             Plaintiffs / Petitioners, :
:
   -against- :
:
:
SCOTT LLOYD, Director, Office of Refugee :
Resettlement; JONATHAN WHITE, Deputy :
Director, Office of Refugee Resettlement; :
STEVEN WAGNER, Acting Assistant Secretary :
for the Administration for Children and Families, :
U.S. Department of Health and Human Services; :
ALEX AZAR, Secretary, U.S. Department of :
Health and Human Services; ELCY VALDEZ, :
Federal Field Specialist, Office of Refugee :
Resettlement; JEREMY KOHOMBAN, President :
and Chief Executive Officer, Children's Village, :
:
            Defendants / Respondents. :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/27/18

18 Civ. 1453 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

     This is a lawsuit about how the U.S. Government treats unaccompanied alien children

("UAC").[1] Generally, when UAC are apprehended by an agency of the Federal Government,

such as Immigration and Customs Enforcement ("ICE"), the agency must transfer custody of the

UAC to the U.S. Department of Health and Human Services, Office of Refugee Resettlement

("ORR") within 72 hours.  6 U.S.C. § 279(a); 8 U.S.C. § 1232(b)(3).  ORR is then responsible

for the care and custody of the UAC, until they are reunited with a family member or placed with

---

[1] 6 U.S.C. § 279(g)(2) defines "unaccompanied alien child" as "a child who–
    A.  has no lawful immigrant status in the United States;
    B.  has not attained 18 years of age; and
    C.  with respect to whom –
        (i) there is no parent or legal guardian in the United States; or
        (ii) no parent or legal guardian in the United States is available to provide care and physical custody."

1

other individuals or entities, while removal proceedings go forward in immigration courts.

When UAC come into ORR's custody, ORR places UAC into one of three types of state

licensed, ORR-funded, caretaker facilities: (1) secure facility; (2) staff-secure facility; and (3)

shelter care facility. A secure facility has the most restrictive custodial condition and it is in

many ways akin to juvenile jails; a staff-secure facility is less restrictive than a secure facility,

but movement within it is substantially controlled; and a shelter care facility is the least

restrictive custodial setting. These facilities are supposed to provide UAC with housing,

education, health, and case management services. The ORR website explains its role as follows:

> "On March 1, 2003, the Homeland Security Act of 2002, Section 462, transferred responsibilities for the care and placement of unaccompanied alien children from the Commissioner of the Immigration and Naturalization Service to the Director of the Office of Refugee Resettlement (ORR).
>
> Since then, ORR has cared for more than 175,000 children, incorporating child welfare values as well as the principles and provisions established by the Flores Agreement in 1997, the Trafficking Victims Protection Act of 2000 and its reauthorization acts, the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) of 2005 and 2008.
>
> Unaccompanied alien children apprehended by the Department of Homeland Security (DHS) immigration officials are transferred to the care and custody of ORR. ORR *promptly places* an unaccompanied child in the *least restrictive setting* that is in the *best interests* of the child, taking into consideration danger to self, danger to the community, and risk of flight. ORR takes into *consideration the unique nature of each* child's situation and incorporates *child welfare principles* when making placement, clinical, case management, and release decisions that are in the *best interest of the child*." (Emphases added).[2]

The Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") mandates that ORR

"promptly" place UAC "in the least restrictive setting that is in the best interests of the child." 8

U.S.C. § 1232(c)(2)(A). Prompt placement of the child is critical to minimize the deleterious

---

[2] *See Unaccompanied Alien Children*, Office of Refugee Resettlement, https://www.acf.hhs.gov/orr/programs/ucs (last visited Jun. 26, 2018).

impact (anxiety, depression, and/or cognitive change) of detention.  There is no dispute that the longer the detention, the greater the impact.

This lawsuit challenges the ORR's newly revised process for placing UAC in the most appropriate setting at the earliest possible opportunity.  In mid-2017, the then-newly appointed director of ORR, Scott Lloyd, added a director review step to the UAC release process, requiring his personal approval of release decisions involving UAC who are housed in a staff-secure facility or have ever been housed in a staff-secure or secure facility.  Plaintiffs claim that the director review step adds unjustifiable delays to the UAC release process and violates the Administrative Procedure Act ("APA"), TVPRA, and Due Process Clause of the Fifth Amendment.  Lead Plaintiff L.V.M., who is an UAC, brings this action on behalf of himself and those similarly situated against Scott Lloyd, Jonathan White, Steven Wagner, Alex Azar, and Ely Valdez ("Defendants") who are federal officers and employees of ORR, seeking injunctive relief and declaratory judgment, as well as habeas relief.[3]

To be clear, this lawsuit does not deal with the Department of Homeland Security's new policy of separating children from their undocumented parents at the border.  Nor does it deal with ORR's apparent loss of contact with 1,500 UAC under its supervision.  Nor the alleged routine and forcible administration of a range of psychotropic drugs at an ORR-funded facility.  Nor the ORR's alleged practice of detaining and transporting UAC to detention facilities without notifying their parents or lawyers.  Nor the ORR's alleged employment of a psychiatrist that has treated children without board certification for nearly a decade.  Rather, this lawsuit challenges only the ORR's process for promptly placing UAC in the most appropriate setting.

---

[3] Plaintiffs also asserted habeas claims against Jeremy Kohomban, the head of Children's Village, a private, not-for-profit corporation which has a contract with ORR to provide facilities to house UAC held by ORR.  All claims against Kohomban have been dismissed.  *See* ECF 76; Tr. 2:10–4:4.  "Tr." refers to the transcript of oral argument held on June 7, 2018.

Plaintiffs move for class certification and a preliminary injunction; Defendants move to dismiss. With this Court's leave, the parties completed expedited discovery. On June 7, 2018, the Court heard oral argument on each of the motions.

For the reasons set forth below, the Defendants' motion to dismiss is **DENIED**; the Plaintiffs' motion for class certification is **GRANTED**; and the Plaintiffs' motion for a preliminary injunction is **GRANTED-IN-PART** and **DENIED-IN-PART**.

Not only have Plaintiffs pleaded plausible statutory and constitutional violations, but they have also adequately demonstrated irreparable injury and the likelihood of success on numerous claims. For example, the APA guards against agency actions instituted based on personal preference of decisionmakers. According to evidence before the Court, Lloyd's director review policy was instituted within hours of Lloyd's appointment as the director of ORR, with no record demonstrating the need for a change. Apparently, the change was based on unidentified news reports about criminal activities involving immigrant minors. Expedited discovery has not yielded any record showing a consideration of relevant law, agency documents, or the impact on UAC. This is at the zenith of impermissible agency actions. This unlawful agency action keeps Plaintiffs—the very subjects that ORR is statutorily mandated to protect—from reuniting with their sponsors for at the very least 35 more days (and likely more than that) in a process which already takes too long.

The Court cannot turn a blind eye to Plaintiffs' suffering and irreparable injury. The Court hereby directs ORR to vacate the director review policy, until further order of the Court.

### *Well Pleaded Allegations Concerning Custody and Processing of Immigrant Children*

Every year, foreign or alien children come to the United States, some with parents, some with relatives, some with friends, and some, alone. A great number of these children have no

legal right to enter. Compl. ¶16. In the 80's and 90's, the government locked up these undocumented children in jail facilities across the country. *Id.* There have been numerous legal challenges to these practices. More than two decades ago, the Supreme Court held that UAC do not have a fundamental right to be placed in the custody of a willing and able private custodian. *Reno v. Flores*, 507 U.S. 292 (1993). Nonetheless, the litigating parties continued negotiations, which ended with a 1997 consent decree (also referred to as the *Flores* settlement) setting standards for the detention, release, and treatment of UAC. The *Flores* settlement mandates that UAC be released "without unnecessary delay" and provides that the Government must engage in "prompt and continuous efforts" towards family reunification.[4] Compl. ¶17.

Since then, Congress has passed two statutes addressing the care and custody of UAC. In 2002, Congress enacted the Homeland Security Act ("HSA"), which transferred authority over the care and placement of UAC to ORR. The ORR's mission is to incorporate child welfare values into the care and placement of UAC. *Id.* ¶18. In 2008, Congress enacted the TVPRA, which grants legal protections to UAC in ORR's custody and directs ORR to (1) promptly place UAC, (2) in the least restrictive setting that (3) is in the best interest of the child. *Id.* ¶19.

ORR has never promulgated any regulations under the TVPRA, but it has developed an internal guide (which was posted online in 2015) setting forth agency procedures for UAC placement and release. *Id.* ¶¶20–21. The guide governs more than 7,000 children in ORR's custody, approximately 1,200 of whom are located in New York. *Id.* ¶22. According to the guide, when a child comes into ORR's custody, ORR places the child into one of three types of facilities: (1) secure facility; (2) staff-secure facility; (3) shelter care facility. *Id.* ¶23. ORR

---

[4] President Trump's Executive Order of June 20, 2018 implicitly recognizes the continuing vitality of the *Flores* settlement by announcing that the settlement needs to be modified.

places UAC in secure or staff-secure facilities for a variety of reasons including, for example, disruptive behaviors, escape risks, or any behaviors which raise safety concerns. *Id.* ¶24.

UAC can move up from a shelter care facility to a staff-secure or secure facility; and down from a secure facility to a staff-secure or shelter care facility. Most UAC, however, are released to family members and others (also known as sponsors) who are qualified to care for them. *Id.* ¶25. Further, ORR places in a long-term foster-care program UAC who have demonstrated safe behavior in a non-secure setting, but have no sponsor. *Id.* ¶¶ 24, 25. The release of UAC is recommended to an ORR Federal Field Specialist ("FFS") by an ORR care provider, after consultation with a nongovernmental third-party reviewer. FFS can approve, reject, or seek more data. *Id.* ¶26.

Prior to the January 20, 2017 change in administration, the release decisions were made expeditiously. UAC in staff-secure facilities (*e.g.*, Children's Village) were released to a sponsor in about 30 to 90 days; and for UAC in shelter care facilities, within 34 days. *Id.* ¶26. Since the change in administration, however, the release of children in a secure or staff-secure facility no longer takes 90 days; it now takes seven to eight months on average. *Id.* ¶35.

Plaintiffs claim that this unconscionable delay results, in part, from a new review policy instituted by the then-newly appointed Director of ORR, Scott Lloyd. Upon taking office, Lloyd instituted a director review policy (reflected in the June 12, 2017 revision to the online ORR guide[5]), under which any UAC who has ever been held in a secure or staff-secure facility cannot be released, unless the release is personally approved by Lloyd or his designee. *Id.* ¶34. Lloyd does not disclose what standards he follows; nor does he describe how he makes his decisions.

---

[5] *ORR Guide: Children Entering the United States Unaccompanied*, Office of Refugee Resettlement (Jan. 30, 2015, as revised on Jun. 12, 2017), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.

Under a policy of his own making, Lloyd has unfettered discretion to approve, deny, or request additional information, unguided by any rule or fixed set of criteria, giving him unrestricted power to rule over the fate of vulnerable children. *Id.* ¶36.[6]

The director review policy allegedly has substantially increased the time for reunification of UAC with their family, or placement in foster care. *Id.* ¶34. The actual review by Lloyd is not the only source of delay; the director level policy also requires FFS to prepare the review package for Lloyd, which adds further delay to the release process. *Id.* ¶37. UAC understandably suffer substantial harm from the director review policy; the prolonged period of detention causes depression, deterioration in mental health, as well as behavioral problems. *Id.* ¶39. But ORR has yet to provide any substantive explanation or justification for the new policy. *See id.* ¶¶41–46.

### *Well Pleaded Allegations Pertaining to Lead Plaintiff L.V.M.*

L.V.M. is a 17-year-old from El Salvador who came to the United States with his mother seeking asylum. *Id.* ¶47. They lived together on Long Island where L.V.M. attended high school. In 2017, ICE arrested him on report that he made a "gang" sign during a scuffle at school. He was removed from his home and sent to a secure facility in Virginia. *Id.* ¶¶50–54. He was held there for six weeks (July 7, 2017 to August 8, 2017), and then transferred to a staff-secure facility, Children's Village. He was held in the ORR's custody for more than seven months, and was not released until after the filing of this action. *Id.* ¶56.

---

[6] Plaintiffs submit that this director review policy is part of the current administration's anti-immigrant campaign grounded on bias, unsubstantiated arguments, and conjecture. *See id.* 27–33.

## DISCUSSION

Defendants move to dismiss the complaint contending that Plaintiffs have failed to state a claim: (1) Defendants' actions are not reviewable by this Court; and (2) even if they were, they do not violate the APA, TVPRA, and Due Process Clause of the 5th Amendment. ECF 61.

Plaintiffs move for certification of a class comprising those who are or will be subject to the director review policy: "all children who are or will be in the custody of ORR in New York State and who are currently housed in a staff-secure facility or have ever been housed in a staff-secure or secure facility." ECF 2. Plaintiffs also move for a preliminary injunction, requesting vacatur of the director review policy and an order requiring ORR to promptly complete the release process for all class members. ECF 41.

For the reasons set forth below, the motion to dismiss is denied; the motion for class certification is granted; and the motion for a preliminary injunction is granted-in-part and denied-in-part.

## I.    Motion to Dismiss

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

**B. Discussion**

Plaintiffs claim that the ORR's director review policy, which causes systemic, unjustified delays in the UAC release process, violates the APA, TVPRA, and Due Process Clause of the 5th Amendment. Defendants move to dismiss, claiming that: (1) the newly adopted director review process is not judicially reviewable; and (2) in any event, the director review process does not violate the APA, TVPRA, and Due Process Clause of the 5th Amendment. The motion to dismiss is denied.

### i. *Challenged Administrative Actions are Reviewable*

"The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' … and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law'". *Bennett v. Spear*, 520 U.S. 154, 175 (1997). Notwithstanding the limited exceptions, there is a strong presumption "that Congress intends judicial review of administrative action." *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986).

### 1. *Challenged Administrative Actions Are Final Agency Actions*

There is no doubt that the challenged administrative actions are final: whatever may be said about how Lloyd conducted (or did not conduct) any review of ORR's release process, what issues were considered, and how those issues were resolved, that decisionmaking process is now complete and the result of that process—the UAC release procedure and the director review policy—is "one that will directly affect" ORR staff and Plaintiffs. *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003). The release procedure and the director review policy indisputably define the rights or obligations of ORR staff and Plaintiffs; and legal consequences flow from them. For example, the director review policy requires that: (1) the ORR's FFS prepare a

director review package for Lloyd's review; (2) Lloyd or his designee review FFS's release recommendations; and (3) Plaintiffs wait for Lloyd's approval before release. Compl. ¶¶34–38. Such agency actions are final and presumptively reviewable.[7] *Bennett*, 520 U.S. at 175.

### 2.  *ORR's Discretion is Not Absolute*

While the APA bars judicial review of administrative actions "committed to agency discretion by law" (5 U.S.C. § 701(a)(2)), that "exception" is a "narrow" one (*Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016)). Government agencies cannot do whatever they wish; it would be a dangerous surprise to learn that agencies have such unchecked discretion. There may be exceptions, but they are applicable only when the statute is "drawn in such broad terms that ... there is no law to apply." *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." *Salazar*, 822 F.3d at 76.

Even a cursory review of the applicable statute demonstrates that the challenged administrative actions here do not fall within the narrow exception. ORR can exercise discretion in the prompt placement of UAC in the least restrictive setting. But the TVPRA does not authorize ORR to place UAC whenever ORR gets around to it or whenever ORR wants to do so; or to keep UAC in heightened security arrangements for however long ORR chooses. The TVPRA imposes meaningful limits on ORR's discretion by specifying standards for applying the TVPRA. *See* 8 U.S.C. § 1232. There is simply no "clear and convincing evidence" of legislative intent to foreclose judicial review of ORR's decisions. *Bowen*, 476 U.S. at 670.

---

[7] Any other holding would permit unreviewed discretion in an area of great sensitivity: the director review causes an extension in the UAC release process, and while their release approval is delayed, UAC are held in custody.

Accordingly, the challenged actions are final agency actions, which are not committed to agency discretion by law.  The challenged actions are reviewable under the APA.

> ### ii. *Plaintiffs have Stated Plausible Claims that Director Review Policy Violates APA and TVPRA*

Under the APA, a court may "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The Court must consider whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs have stated three plausible claims that the director review policy violates the APA.  *First*, the director review policy was instituted without sufficient investigation or justification, in violation of the APA.  Lloyd had no factual or legal basis for adopting the director review policy; he made no analysis of the policy's impact; and he offered no justification for the policy.  Nor is it clear what the goals of the new director review policy are; and since the goals are unknown, the Court cannot assess whether the goals are being achieved; or if achieved, whether they are worthwhile.  "Where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

*Second*, the director review policy in and of itself violates the APA.  Lloyd has no expertise or experience to evaluate the propriety of the release decision made by a skilled FFS. *See* Compl. ¶34.  Moreover, there is no indication whatsoever of what facts or factors should be considered in making his decision.  Further, there is no rational basis for the director review

policy.  There is no good reason to permit such unchecked exercise of discretion, with no guidance nor limitation.  Accordingly, Lloyd's release decision, which is not subject to any known decision criteria, is arbitrary and capricious, in violation of the APA.

*Third,* and more critically, the director review policy adds substantial and unnecessary delay to the Plaintiffs' release, in violation of both the APA and TVPRA.[8]  The director review policy adds substantial delay to, and, in some cases, completely stops the Plaintiffs' release process.  *Id.* ¶35.  Close to a dozen children remain detained despite having spent an average of over seven months in the ORR's custody.  *Id.*  Such a substantial increase in the detention period to accommodate the ORR's director review policy, which has no defined purpose, is a clear violation of the TVPRA's mandate to promptly place the UAC in the least restrictive setting that is in the best interests of the child.

### iii.  *Plaintiffs have Stated Plausible Claim that Systemic Delay in Release Process Violates APA and TVPRA*

As discussed above, since Lloyd took office at ORR, there has been a substantial increase in the detention period for members of the putative class.  *Id.*  The director review policy slows down the UAC release process, not only because the director review itself takes time, but also because it slows down preliminary stages of the release process.  For example, case managers in ORR shelters substantially delay forwarding release recommendations because they believe that they may need to collect information to further substantiate their release recommendation.  *Id.* ¶37.  Moreover, the stepdown of children from staff-secure care to shelter care—often a necessary precursor to release—has also slowed dramatically. *Id.* ¶38.  These allegations of

---

[8] Although Plaintiffs initially asserted that the TVPRA provided an independent cause of action, Plaintiffs now claim that the violation of the TVPRA can be asserted as a violation of the APA.  The Court agrees.  *See* 5 U.S.C. § 706(2)(A) (Under the APA, a court may "hold unlawful and set aside agency action, findings, and conclusions found to be ... *otherwise not in accordance with law*") (emphasis added).

systemic delay are sufficient to support a plausible claim that ORR has violated the TVPRA's mandate to promptly release UAC to the least restrictive setting, in violation of the APA.

### iv. *Due Process Claim under the Fifth Amendment*

Defendants contend that the due process claim should be dismissed "in light of the fact-specific nature of due process claims," arguing that the Supreme Court has recently expressed doubt that Rule 23(b)(2) is a proper vehicle for bringing due process claims. ECF 64 ("Gov. Mem.") 47–48 (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018)). Defendants' argument is predicated on the Court's denial of class certification, but as discussed *infra*, a class is certified.

For the foregoing reasons, the Court concludes that Plaintiffs have stated cognizable claims to relief. The motion to dismiss is denied.

## II.   Motion for Class Certification

### A.  Legal Standard

Under Federal Rule of Civil Procedure 23(a), plaintiffs may sue as a class only if: "(1) the class is so numerous that joinder of all members is impracticable [("Numerosity")]; (2) there are questions of law and fact common to the class [("Commonality")]; (3) the claims or defenses of the representative parties are typical of those of the class [("Typicality")]; and (4) the representative parties will fairly and adequately protect the interests of the class [("Adequate Representation")]." The class must also satisfy at least one of the requirements contained in Federal Rule of Civil Procedure 23(b). *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Here, Plaintiffs seek certification under Rule 23(b)(2), which permits certification "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

**B. Discussion**

Plaintiffs seek to certify the following class:

> all children who are or will be in the custody of ORR in New York State
> and who are currently housed in a staff-secure facility or have ever been
> housed in a staff-secure or secure facility.

ECF 2. Defendants do not dispute that the numerosity and adequate representation requirements

of Rule 23(a) are satisfied here. The putative class comprises at least 40 members, and

numerosity is generally presumed "at a level of 40 members." *Consol. Rail Corp. v. Town of*

*Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Adequate representation is also satisfied because

L.V.M. has "an interest in vigorously pursuing the claims of the class" and has "no interests

antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253,

268 (2d Cir. 2006). *See* ECF 2-1 ("L.V.M. Decl.") ¶3; ECF 52 ("L.V.M. Supp. Decl.") ¶12.

Defendants contend, however, that the putative class fails the commonality and typicality

requirements (Rule 23(a)), and that the challenged administrative actions do not "apply generally

to the class" (Rule 23(b)(2)). The Court disagrees.

### *i.   Rule 23(a) Factors*

#### *1.   Commonality*

"Commonality is satisfied where a single issue of law or fact is common to the class." *In*

*re IndyMac Mort.-Backed Sec. Litig.*, 286 F.R.D. 226, 233 (S.D.N.Y. 2012) (citing *Wal-Mart*,

564 U.S. at 358 ("[E]ven a single common question will do.")).

Here, the commonality requirement is easily satisfied as to the APA and TVPRA claims.

The following questions are common to all putative class members: (1) whether the director

review policy is lawful under the APA, or under the APA *and* TVPRA; (2) whether the process

used to institute the director review policy was lawful under the APA; and (3) whether the

addition of systemic delay to an already too long release process is lawful under the APA and

TVPRA.  The answers to these questions are common to all putative class members, and do not

involve any analysis of independent facts attributable only to individual plaintiffs.  These

questions of fact and law would "generate common answers apt to drive the resolution of the

litigation." *Wal–Mart*, 564 U.S. at 350.  *See also Marisol A. v. Giuliani,* 126 F.3d 372, 376–77

(2d Cir. 1997) (noting that commonality exists when plaintiffs establish "that their injuries derive

from a unitary course of conduct by a single system"); *Barnett v. Bowen*, 794 F.2d 17, 23 (2d

Cir. 1986) ("[I]t would still be appropriate to define a class to include all applicants who may

experience unreasonable delays . . . despite the fact that the point at which delays become

unreasonable may vary with the facts and circumstances of individual cases.").

     Likewise, to the extent that the due process claim challenges the ORR's director review

policy and its *systemic* delay in the release process (instead of the ORR's individual release

decisions), it also poses common questions of fact and law.  This due process claim, arising

solely from the ORR's standardized conduct that applies uniformly to all putative class members,

need not entail factual analyses attributable only to individual plaintiffs.  Accordingly, the

Supreme Court's precaution in *Jennings v. Rodriguez* against certification of a 23(b)(2) class

based on a due process claim is not applicable here.  *See also Abdi v. Duke*, 280 F. Supp. 3d 373

(W.D.N.Y. 2017); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1205 (N.D. Cal. 2017).

     *2.  Typicality*

     Typicality "is satisfied when each class member's claim arises from the same course of

events and each class member makes similar legal arguments to prove the defendant's liability."

*Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).

     Defendants urge that there is no typicality here because "the length of time [L.V.M.]

spent in ORR custody was not due to the Director Review policy that he seeks to enjoin, but

rather to individualized decisions made in the field." Gov. Mem. 36. The Court disagrees. Each of the Plaintiffs' claims, including the due process claim, arise from the same course of events that involve only the Defendants' conduct. For example, the claims arise from (1) the complete lack of process for instituting the director review policy, (2) the ORR's justification (or lack thereof) for the director review policy, and (3) the systemic delay in the ORR's implementation of the director review policy and the release process. There is simply no factual variation between the class members' claims because the claims arise solely from the Defendants' conduct. Accordingly, the Court concludes that the typicality requirement is satisfied.

> ii. *Rule 23(b)(2)*

Rule 23(b)(2) permits a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Defendants claim that Rule 23(b)(2) is an inappropriate vehicle to certify the class, for two reasons: (1) the propriety of the challenged administrative actions "turns on the reasonableness of the particular circumstances of each [release] application"; and (2) "enjoining Director Review would provide no relief at all for the 21 members of the putative class who are not eligible for release because they have no sponsor." Gov. Mem. 39. The Court disagrees.

*First*, the propriety of the challenged administrative actions does *not* turn on the particular circumstances of each plaintiff. Rather, as discussed above with respect to the commonality and typicality requirements, Plaintiffs' claims arise solely from the Defendants' conduct. Accordingly, a single injunction directed to Defendants' conduct "would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

*Second*, a single injunction enjoining director review would provide relief to the entire class, even for 21 class members who currently do not have a sponsor.  The director review policy causes two types of delays: (1) a direct delay arising from the actual review of a director review package; and (2) an indirect delay arising from the preparation of the director review package and the slowdown in the process that reduces the UAC's burden of confinement from a staff-secure facility to a shelter care facility.  ECF 45 ("Zayas Decl.") ¶27; Tr. 76:18–21.  Even if the 21 class members do not yet have a sponsor, they are still subject to the indirect delay.  As a single injunction enjoining director review would eliminate both direct and indirect delays, the injunction would provide relief even to those that are not currently awaiting director review.[9]

For the reasons set forth above, the Court determines that Plaintiffs have established, by a preponderance of the evidence, the requirements of Rule 23(a) and Rule 23(b)(2) for the proposed class.  Accordingly, the Plaintiffs' motion for class certification is granted.

## III.   Motion for Preliminary Injunction

Plaintiffs seek an injunction to vacate the ORR's director review policy and to direct ORR to take all reasonable measures to expedite the processing of reunification requests made

---

[9] The Court would certify the class even if the class were limited to 24 UAC with sponsors (and excluded the 21 class members who do not yet have sponsors).  Defendants concede that these 24 members are "eligible for" director review.  Gov. Mem. 24.  Accordingly, Defendants cannot dispute that a class comprising these 24 members would satisfy Rule 23(b)(2).  This hypothetical class of 24 members would also satisfy the requirements of Rule 23(a)(2), including numerosity.  Numerosity may be found where "the number of class members is sufficiently large so that joinder ... would make litigation needlessly complicated and inefficient".  *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002).  "[T]he numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members."  *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).  Notwithstanding the limited size of the hypothetical class, the class action would be superior to joinder under *Morgan Stanley* because all plaintiffs challenge a policy that affects them uniformly; the putative class members do not have sufficient means to bring lawsuits; and the requested injunctive relief would impact all future class members.

by members of the class. ECF 41. The motion is granted-in-part and denied-in-part. ORR is enjoined from implementing the director review policy until further order of the Court.[10]

### A. Legal Standard

Courts may "grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Riddick v. Maurer*, 2018 WL 1750582, at *2 (2d Cir. 2018) (internal quotation marks omitted). "Where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Andino v. Fischer*, 555 F.Supp.2d 418, 419 (S.D.N.Y. 2008).

### B. Discussion[11]

#### i. *Irreparable Harm*

Plaintiffs have made a strong showing that they will suffer irreparable harm, unless they are granted the requested relief.

Unsurprisingly, neither party questions that prolonged detention is deleterious to young children, and, obviously, the longer the detention, the greater the harm. Equally unsurprisingly,

---

[10] Plaintiffs and Defendants dispute certain facts, and oral testimony of witnesses may be warranted. *Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988). The parties, however, have stipulated to rest their claims on a paper record and waive their right to an evidentiary hearing. *See* Tr. 60:13–14; 21–23. "An evidentiary hearing is not required … when the disputed facts are amenable to complete resolution on a paper record" or the parties "waive its right to an evidentiary hearing." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998). Accordingly, the Court reviews the instant motion on a paper record without an evidentiary hearing.
[11] Plaintiffs move for a preliminary injunction based on the APA and TVPRA claims, but not the due process claim.

neither party disputes that the director review policy imposes significant delays (at least 35 days)
on the release of UAC from ORR's custody, which already takes too long. The "overall average
length of time for children who are in ORR custody is currently 57 days" (Tr. 40:23–24; 94:14–
15), but "the average length of time that the plaintiff class spends detained is 242 days" (*id.*
56:21–22; 104:22–23). The largest single component of delay is the 35 days needed for review
of the director review package in the Office of Director (ECF 44 ("Rafael Decl.") ¶11(b); Tr.
65:6–8; 84:17–18, 88:14–15), as well as "significant" delays even before the application is
escalated for director review (Zayas Decl. ¶37). *See also* ECF 36-4 ("Carey Decl.") ¶17 ("the
very act of adding headquarters review to decisions in individual cases will add substantial time
just as a matter of process"). What is disputed (surprisingly) is whether the more than 35 days of
average delay would impose irreparable harm on Plaintiffs. *See* Gov. Mem. 14; Tr. 82:10–13,
20–22; 84:17–20.

It is clear to this Court that the 35 days of average delay imposed by the director review
policy, as well as additional delays incurred even before the application is escalated for director
review, causes irreparable injury to Plaintiffs. Multiple experts have opined that even a short
detention can have "deleterious effects" on minors (Zayas Decl. ¶32), causing "psychological
trauma and induce long-term depression, anxiety and PTSD" (ECF 46 ("Fortuna Decl.") ¶16)
that are not necessarily resolved once the detainee is freed (*id.* ¶17). *See also* Carey Decl. ¶17
("even short delays of a few days can have serious implications for child well-being"). The
Court finds these opinions reliable and credible. The Court is mindful of the vulnerable and
exposed nature of UAC, and concludes, at the very least, that the delay incidental to the
challenged director review policy (more than 35 days) is clearly long enough to cause irreparable

harm to Plaintiffs.  *See* Zayas Decl. ¶32 ("Stays as short as 14 days can have deleterious effects on youth").

    *ii.   Likelihood of Success*

To warrant a preliminary injunction, Plaintiffs "need not show that there is a likelihood of success on the merits of all of [their] claims for relief.  Rather, [Plaintiffs need to] show a likelihood of success on the merits of at least one of [their] claims." *Westchester Legal Servs., Inc. v. Westchester Cty.*, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985). *See also Kaufman v. Cooper Companies, Inc.*, 719 F. Supp. 174, 185 (S.D.N.Y. 1989).  Here, Plaintiffs have demonstrated that they will likely succeed on their claims challenging the director review policy: the director review policy was arbitrary and capricious, both in its inception and in its operation.

*First*, the record is clear that Lloyd adopted the director review policy without any reasoned analysis.  He adopted the director review policy: (1) within hours of becoming the ORR director (Lloyd Tr.[12] at 149:1–12; 150:4–7); (2) relying on unidentified news reports on criminal gang activities involving immigrant minors[13] (*id.* at 151:2–9); and (3) without reviewing any agency documents or assessing the impact on UAC (*id.* at 156:22–157:3, 158:11–15).  This is at the zenith of arbitrary and capricious administrative actions, and is a clear violation of the APA. The APA does not tolerate an agency action that is instituted based on "the personal preferences of the decisionmakers".  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 548 (2009). Although agencies are permitted to exercise discretion, their discretion is "limited and bound with the rule of reason and law and agencies cannot act according to their wills and private

---

[12] Lloyd Tr. refers to the deposition transcript of Scott Lloyd.
[13] In late 2017, a Federal court in San Francisco ordered immigration judges to review the basis for ICE and ORR's determination that certain UAC had gang involvement.  *See Saravia*, 280 F. Supp. 3d at 1206.  The immigration judges determined that in 27 of 29 cases, there was no basis for the government's assertion of gang involvement. Compl. ¶33.

affections". *Id.* (quoting *Rooke's Case*, 77 Eng. Rep. 209, 210, 5 Coke Rep. 99b, 100a (C.P. 1598) (Coke, J.)). Vulnerable UAC cannot, and should not, be held hostage to an administration's flight of whimsy. *See Guzman v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 931 F. Supp. 2d 488, 494 (S.D.N.Y. 2013) ("An agency's action is arbitrary and capricious if it was ... without justification in fact." (internal quotation marks omitted)).

Lloyd belatedly claims, in his declaration, that he adopted the director review policy "based on [his] observation and experience while in [his] special advisor role [at ORR]". ECF 62 ("Lloyd Decl.") ¶8. He now explains that he wanted to ensure that he understood how ORR was addressing the most difficult release decisions, and that he held up the standard of accountability. *Id.* ¶9.

This is a dubious argument at best and the Court is skeptical of the explanation. It is not at all clear what purpose the director review serves. It does not improve the placement process, but it does substantially increase the processing time, to the detriment of the UAC. In any event, the Court need not determine whether these purported reasons sufficiently justify the director review policy because they are not supported by any contemporaneous evidence. The Second Circuit has made it clear that "after-the-fact rationalization for agency action is disfavored" and that the agency is permitted to submit such after-the-fact rationalization "only if the proffered evidence illuminates the original record and does not advance new rationalizations for the agency's action." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81–82 (2d Cir. 2006) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Here, there is simply no "original record" to illuminate. *Id.* at 82. Defendants have not produced any contemporaneous evidence explaining the process used to adopt the director review policy, or the rationale for implementing it. *See* ECF 43 ("Katovich Decl.") ¶¶14–16. Nor can they point to anything the director review

achieves, other than adding more time to a process which already takes too long. Accordingly, the Court declines to entertain Lloyd's after-the-fact explanations.

"Where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious," in violation of the APA. *Encino*, 136 S. Ct. at 2125. Accordingly, Plaintiffs have made a clear showing of likelihood of success on their claim that the process used in adopting the director review policy was arbitrary and capricious in violation of the APA.

*Second*, Plaintiffs have also clearly demonstrated the likelihood of success on their claim that the director review policy in and of itself violates the APA. The Court finds no rational relationship between the director review policy and the ORR's apparent goal "to release every UAC to a suitable sponsor" (ECF 65 ("Fields Decl.") ¶5), nor do Defendants provide any (*see* Tr. 88:24–89:15). Indeed, the director review policy is antithetical to the statutory goal of prompt release of UAC to suitable sponsors. Moreover, Lloyd has no expertise or experience to evaluate the propriety of the release decision made by a skilled FFS.[14] This is especially so because his release decision is not subject to any written guidelines or specific criteria. *See* Zayas Decl. ¶¶20–21; Carey Decl. ¶18. There would be no record of how he made his decision, or why he did so. Lloyd's release decisions are thus likely arbitrary and capricious, in violation of the APA.

*Third*, the record is also clear that the director review policy adds unconscionable delay to Plaintiffs' release, in violation of the APA and TVPRA. As discussed above, there is no dispute that the director review policy incurs more than 35 days of average delay. *See supra*. These delays are substantial, especially in view of the vulnerable nature of immigrant children,

---

[14] Prior to his appointment as the Director of ORR, he served as a senior policy coordinator for Knights of Columbus Public Policy Office (Katovich Decl., Ex. T). The Knights of Columbus is a Catholic fraternal organization engaged in charitable work. It also sells life insurance to its members.

and is clearly antithetical to the TVPRA's mandate to promptly release UAC to the least restrictive setting. Accordingly, Plaintiffs are likely to prevail on their claim that the director review violates the APA and TVPRA.

For these reasons, the Court concludes that Plaintiffs have established the likelihood of success on their claims.

### iii.  *Balance of Equities and Public Interest*

The balance of equities and public interest strongly favors Plaintiffs. Obviously, ORR cannot suffer any harm from an injunction that terminates an unlawful practice. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). "Granting preliminary injunctive relief will simply require Respondents to comply with their legal obligations." *Abdi*, 280 F. Supp. 3d at 410. In contrast, Plaintiffs would suffer irreparable harm should the Court deny the preliminary injunction. *See supra*. Also, this Court is hard-pressed to see how setting aside an unlawful practice could be against the public interest. Plaintiffs do not seek a blanket release of all UAC; they merely seek protections afforded to them by the APA and TVPRA. Accordingly, the balance of equities and public interest decidedly favors Plaintiffs.

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction.

### iv.  *Injunctive Relief*

Plaintiffs seek two types of injunctive relief: (1) vacatur of the director review policy; and (2) an order directing ORR to take all reasonable measures to expedite the processing of reunification requests. The Court grants the first relief, and denies the second.

Under Federal Rule of Civil Procedure 65(d), an injunction must: (1) state the reasons why it issued; (2) state its terms specifically; and (3) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required. This rule

requires that an injunction be "more specific than a simple command that the defendant obey the law." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011). Moreover, any injunctive relief "should be narrowly tailored to fit specific legal violations." *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).

Here, enjoining the director review policy is appropriate. Defendants urge that, even if the Court were to find that the director review policy would likely violate the APA and TVPRA, the Court should issue remand without vacatur. Gov. Mem. 32–33. The Court declines the invitation. "To determine if vacatur is appropriate, a court weighs the 'seriousness of the agency action's deficiency (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Nat. Res. Def. Council v. U.S. E.P.A.*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) (quoting *Comcast Corp. v. F.C.C.*, 579 F.3d 1, 8 (D.C. Cir. 2009)). Both factors favor vacatur. The director review policy was adopted in violation of the APA, adding unnecessary delay to the release process (which already takes too long), and in the end achieves no discernable benefit. Moreover, the director review policy is not rationally related to the TVPRA's mandate to promptly place the UAC in the least restrictive setting. Further, vacatur would not disrupt the UAC release process; indeed, vacatur would streamline it. Accordingly, the Court concludes that vacatur of the director review policy is appropriate.

In contrast, an order directing ORR to expedite the processing of reunification requests is not appropriate at this time. Plaintiffs concede that some time is necessarily consumed in complying with the TVPRA. 8 U.S.C. § 1232; Tr. 65:22–66:18. Further, there is no record of which required step takes what length of time. In these circumstances, an order to expedite the processing is not much more than a direction to "hurry up" and that is not a proper injunction.

*Petrello v. White*, 533 F.3d 110, 115 (2d Cir. 2008) ("[A]n order for specific performance that lacks specificity is not a proper injunction."). Moreover, the requested command is not "narrowly tailored to fit specific legal violations." *Banas*, 658 F.3d at 272. The legal claims which Plaintiffs are likely to succeed on are grounded in the director review policy. *See supra.* Any injunctive remedy must thus be narrowly tailored to address the director review policy. Accordingly, the Court concludes that the order directing ORR to expedite the processing of reunification requests is not appropriate.[15]

For the foregoing reasons, the motion for a preliminary injunction is granted, and Defendants are directed to vacate the director review policy until further order of the Court.

## CONCLUSION

The motion to dismiss the Complaint is denied; the motion for class certification is granted; and the motion for a preliminary injunction is granted-in-part and denied-in-part. Defendants are ordered to vacate the director review policy, as reflected in *ORR Guide: Children Entering the United States Unaccompanied* as revised on June 12, 2017, until further order of the Court.

The Clerk of the Court is directed to close the pending motions at ECF 2, 41, and 61.

Dated: New York, New York
      June 27, 2018

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[15] During the June 7, 2018 oral argument, Plaintiffs' counsel attempted to add specificity to the requested relief: Plaintiffs' counsel proposed directing Defendants to create a remedial plan and imposing a deadline for adjudicating a release packet. *See* Tr. 77:21–80:10. Plaintiff may well be entitled to this relief, but not on the current record. Further factual development is necessary before this relief can be granted.